# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00025-CV

**Jerry Scarbrough, Denise Steele, and Melissa Victoria Deaton, Appellants**

**v.**

**Helen Purser; Sue E. Purser a/k/a Sue E. Van Zanten; Gary W. Purser, Jr.;
JoAnn M. Purser; and Elizabeth H. Tipton, Appellees**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
### NO. 236,117-B, HONORABLE ALAN MAYFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Attorney Jerry Scarbrough and his former clients, Melissa Victoria Deaton[1] and Denise Steele,[2] appeal from a jury verdict in favor of Helen Purser, Sue E. Purser a/k/a Sue E. Van Zanten, Gary W. Purser Jr., JoAnn M. Purser, and Elizabeth H. Tipton (the Purser Family) on claims of fraud, defamation, and defamation per se. The Purser Family's suit asserted defamation and fraud claims arising from allegations that Deaton and Steele initiated an inappropriate relationship with family patriarch Gary W. Purser, Sr.[3] and financially exploited him

---

[1] Appellants' counsel filed a suggestion of death for Deaton, stating a presumption that Deaton would want this appeal to continue.

[2] Counsel for appellants stated at oral argument that Steele's last name has changed to Pierce. For clarity, we will refer to this appellant by her former last name, consistent with the evidence, jury charge, and judgment in this case.

[3] Purser Sr. was Helen's husband, the father of Elizabeth, Gary Jr., and Sue, and the father-in-law of JoAnn, who is married to Gary Jr.

while he suffered from dementia. The suit alleged that Scarbrough, the attorney who represented Deaton and Steele, conspired with his clients and also that he defamed the Purser Family by accusing them of abusing and murdering Purser Sr. The jury's final judgment held Scarbrough, Steele, and Deaton jointly and severally liable for defamation and fraud based on the jury's findings that they acted in concert or in conspiracy. The jury also found that appellants acted with malice or gross negligence and awarded exemplary damages of $13.5 million. Additionally, the court ordered sanctions totaling $54,261.50 against Scarbrough and $5,000 against Deaton for discovery abuse.

In a voluminous and rambling appeal, Scarbrough raises 26 issues and Steele and Deaton raise 14 overlapping ones, primarily challenging the sufficiency of the evidence supporting the jury's findings.[4] They contend that the district court lacked jurisdiction over the Purser Family's claims and that the court should not have given a spoliation instruction. They also contend that there was no evidence to support a variety of the jury's findings and no clear-and-convincing evidence of appellants' actual malice or gross negligence.

Scarbrough separately contends that the court erred by denying his requested question and instruction on his claim that, as an attorney, he should have qualified immunity, and that there was no clear-and-convincing evidence he made any statement that was perceived as tending to affect a person injuriously or charging a person with illegal or immoral conduct. Scarbrough also contends that there was no basis for the discovery sanctions awards against him, that the Purser Family lacked standing to seek sanctions, that the exemplary damage and sanctions awards against him are

---

[4] Steele and Deaton's brief identifies fifteen issues but skips number thirteen, lists the "fourth issue" twice, and wholly omits their fraud-by-failure-to-disclose issue.

2

excessive and unconstitutional, that the court abused its discretion by denying his requested Rule 13 sanctions, and that he was entitled to "immunity from prosecution" for his report about Purser, Sr. to Adult Protective Services.

For the reasons that follow, we will reverse the portions of the judgment awarding compensatory damages to the Purser Family on their defamation and fraud claims against Scarbrough, Steele, and Deaton, with the exception of the unchallenged awards of past mental anguish damages for defamation; reverse the exemplary damages awards against Steele and Deaton; modify the exemplary damages award against Scarbrough by applying the statutory cap; and affirm the district court's orders imposing sanctions against Scarbrough and Deaton.

## BACKGROUND[5]

**Purser Sr. meets Steele**, **Deaton, and Olvera**

Gary Purser Sr., a successful land developer and owner of several construction companies in Killeen, was in his late 70s and alleged to be in the early stages of Alzheimer's disease when he met then 29-year old Denise Steele at the Red Lobster where she worked. Steele introduced Purser Sr. to her live-in boyfriend, Clayton Olvera, and to her friend, Melissa Deaton. Purser Sr. eventually hired Olvera to manage a business called Freytag Irrigation. According to Olvera, Purser Sr. and Steele began a romantic relationship and met weekly at a hotel, then later at Deaton's home. Olvera testified that over time, Purser Sr. gave Steele jewelry, weekly payments of $500, $5,000 every other week for a car, money for attending real-estate classes and starting a sports bar,

---

[5] The background is summarized from evidence in the record of this appeal.

3

and money to pay for cosmetic surgery.  Steele admitted that Purser Sr. gave her money, but she denied that he paid for any medical procedures.  She testified that Purser Sr. told her he had made several men into millionaires and he wanted "to make [her] the first woman millionaire."  Steele and Deaton were recorded discussing a property-development scheme with Purser Sr. in which the women would split $2.5 million each (the "secret recording").  In that recording they also discussed having Purser Sr.'s children and a fantasy of traveling to Las Vegas together.  During that same discussion they told Purser Sr. that when he died, he should not do as some people who leave all their money to a dog because he had Steele and Deaton.  Steele and Olvera later broke up, and Olvera was eventually fired from Freytag.  During this time, Purser Sr.'s family alleges that his deteriorating health caused memory loss, disinhibition, hypersexuality, and behavior that was out of character for him.

**Olvera sues Purser Sr. and Purser Family files third-party claims**

In a demand letter to the Purser Family after his firing from Freytag, Olvera threatened to file a lawsuit—and in it revealed that Purser Sr., who was highly regarded in the community, had carried on a secret affair with Steele and lavished money and gifts on her—unless the family paid Olvera hundreds of thousands of dollars.  Deciding to investigate the truth of Olvera's allegations, the Purser Family monitored Purser Sr.'s location through his phone and discovered his numerous meetings with Steele at Deaton's house.  Before one such meeting, Purser Sr. told his family that he was going to Killeen, but his phone showed that he was on IH-35 driving to Temple.  Tracking his travel, Purser Sr.'s daughter-in-law JoAnn arrived at Deaton's house and called her husband Purser Jr. and her sister-in-law Elizabeth, who both joined her there.

4

They heard Purser Sr.'s voice outside the house, and they confronted Steele and Deaton in the backyard. JoAnn videotaped the confrontation. When Steele told JoAnn that she and Purser Sr. were "just friends," JoAnn became upset and cursed at her, believing that the "two women were taking advantage of an old man." Deaton called 911, reporting that people were attacking her. JoAnn also called 911 to clarify that Deaton was not being attacked, that Steele and Deaton "were taking advantage of an older man with a problem" and that his family was trying to get him away from them.

About two months later, after the family told Purser Sr. that they had put a GPS device on his vehicle, Helen Purser called JoAnn to report that money was missing from their safe, that Purser Sr. had driven away, and that she wanted to know where Deaton lived. JoAnn testified that she did not want her 75-year-old mother-in-law driving to Temple, so she told Helen that she would follow up on the matter. GPS showed JoAnn that Purser Sr. drove to his business office. When JoAnn arrived, staff told her that Purser Sr. had borrowed keys to a truck he did not usually drive. Thinking that he had switched vehicles to avoid the GPS, JoAnn drove to Temple and parked across the street from Deaton's house, waiting to confirm whether that was Purser Sr.'s destination.

Purser Sr. arrived in the truck and parked in Deaton's driveway. JoAnn walked up to the driver's side window of the truck where she saw Purser Sr. counting out $100 bills into three piles on his lap, $9,300 in all, which she presumed he planned to give to Steele or Deaton. After Purser Sr. refused to exit the truck, JoAnn knocked at Deaton's door, identified herself, and stated that Purser Sr. was there with money and she wanted to know what was going on. Deaton did not answer and JoAnn walked back to the truck, where she did not see the money. Purser Sr. told her that he had hidden it and she would not find it. JoAnn entered the passenger side of the truck, found

5

the money in an envelope in the glove compartment, and struggled with Purser Sr., telling him that they needed to go home and sort things out. Eventually, JoAnn took the envelope and got into her car with Purser Sr. at her window demanding the money. JoAnn had begun to "creep away" in the car when the police arrived. Deaton had called 911 reporting that JoAnn was dragging Purser Sr. down the street with her car and probably had weapons. JoAnn testified that no charges were filed because the first-responding officer's dash-cam video, reviewed by all three responding officers at the scene, showed that JoAnn had not dragged Purser Sr.[6]

Before confirming Purser Sr.'s meetings with Steele and Deaton, the Purser Family had noticed Purser Sr. doing some unusual things: attempting to sell the same property to two different buyers, losing his way home from a funeral (while driving through the town in which he had developed several subdivisions), and giving faulty instructions to employees. His family took him to a doctor who diagnosed Purser Sr. with early signs of Alzheimer's, a form of dementia.

Olvera eventually followed through on his litigation threat, filing a breach-of-contract and tortious-interference suit against Purser Sr., Freytag Irrigation, and the Purser Family Trust. The Purser Family subsequently filed third-party claims against Steele and Deaton. Lawyer Scarbrough represented Steele and Deaton in the suit, but he withdrew from that representation after he was also named a defendant.

---

[6] Deaton made other 911 calls accusing JoAnn of threatening to kill her and assaulting her. Police investigations determined that Deaton's allegations were false and phone records tended to disprove the alleged death threat.

6

**Defamation allegations and discovery sanctions**

During the litigation, Purser Sr. developed pneumonia and died at a hospital. The next day, Scarbrough sent a letter to Jack Crews, one of the lawyers for the Purser Family, requesting that an autopsy be performed to confirm whether Purser Sr. had dementia.[7] Scarbrough also contacted Dan Carter, the director of the funeral home where Purser Sr.'s arrangements were underway; Bill Cooke, a justice of the peace in Killeen; the Temple Police Department; and the Texas Rangers, all to discuss Purser Sr.'s death. In each of these conversations, Scarbrough accused the Purser Family of murdering Purser Sr. Scarbrough also reported to Adult Protective Services that the Purser Family abused Purser Sr., and later in open court Scarbrough accused Purser Jr. and JoAnn Purser of being drug addicts. While JoAnn was running for election as a trustee on the Killeen Independent School District board, Scarbrough posted to YouTube a video of the backyard incident at Deaton's house and audio of the 911 call that JoAnn placed during that incident.

Unknown to the Purser Family, before Purser Sr. died, Steele and Deaton told him in a recorded conversation that his family was after his money, that he could not trust his family, and that the family wanted him institutionalized. The women urged him to put his money in a safe in Deaton's house and come live with them. Purser Sr. allegedly began to believe what the women told him and became suspicious of his family.

During discovery, Scarbrough had given a digital recorder that contained the above-mentioned conversation to Shawn Richeson, his "IT guy," to enhance clarity by removing

---

[7] Scarbrough acknowledged that when he was serving as counsel for Deaton, he filed a motion for appointment of a guardian ad litem contending that Purser Sr. was a mentally incapacitated person who lacked a guardian (even though Purser Sr. was represented by counsel at the time). Also, in an accidental recording Scarbrough made while carrying a recorder Deaton gave him, Scarbrough told his wife that Purser Sr. had dementia.

static and background noise. Richeson connected the recorder's USB drive to his computer, downloaded the contents of the recorder, and returned the recorder to Scarbrough. When Richeson listened to the recording, he was concerned about what he heard and thought he recognized Purser Sr.'s voice. He told a Purser Family friend, John Fisher, that the recording sounded like a couple of women trying to take advantage of an old man, and Richeson gave Fisher access to the audio file through the Internet, allowing Fisher and the Purser Family to listen to it. Fisher heard the recording of the women telling Purser Sr. that his children were turning against him and intended to institutionalize him and testified that they sounded to him like "gold diggers."

Scarbrough, Steele, and Deaton repeatedly denied the existence of this recording in their discovery responses, depositions, and in sanctions hearings. Scarbrough initially told the Purser Family's counsel that all the tapes and audio recordings he had were already produced in discovery. But during Deaton's third deposition,[8] Scarbrough stated that at one time Deaton had given him possession of a digital recorder, which he gave to his "IT guy" and returned to Deaton after producing one recording from that device in discovery—and that he was now aware of another recording on the device that he had not heard and had not yet produced. Deaton later told the court that she had disposed of Steele's digital recorder by giving it to Goodwill or throwing it in the trash.

At the subsequent sanctions hearings arising from this situation, Richeson testified that without the digital recorder he could not confirm what recordings had been on it and that he no

---

[8] Deaton's deposition was taken three times, on December 14, 2010, January 7, 2011, and June 29, 2011. Her first deposition ran for several hours but was suspended by agreement of counsel for the re-taking of Clayton Olvera's deposition. After Deaton's second deposition, Elizabeth Tipton was added to the lawsuit, resulting in the third setting. Her third deposition was ultimately suspended because of Scarbrough's announcement that Deaton had additional recorded witness statements of Purser Sr. that had not been produced in discovery.

longer had on his server all that he had recovered from the recorder. At the end of the hearing, the district court imposed $25,000 in sanctions against Scarbrough, $5,000 against Deaton for her disposal of the digital recorder, and ruled a spoliation instruction could be included in the court's charge if the evidence at trial supported it (the court later determined that it did and gave the instruction at trial). Scarbrough was also ordered to pay sanctions of $11,000 and $15,959.50 for violating the court's confidentiality order twice by disclosing information from Purser Sr.'s medical records to the Temple Police Department and to Purser Sr.'s niece, Carolyn Bolling (to whom Scarbrough had misrepresented himself as Purser Sr.'s lawyer).

The case proceeded to a jury trial, resulting in a unanimous verdict for the Purser Family, with a total of $19,440,000.00 awarded. The lengthy jury trial gave rise to an even lengthier appeal, the numerous issues of which we address in turn.[9]

## DISCUSSION

### I. Defamation issues

**A. Defamation of appellees individually**

None of the appellants challenge the jury's finding that they each made statements that were defamatory and false. Rather, appellants contend that there is no evidence that such defamatory statement identified any member of the Purser Family individually—i.e., appellants did not specifically name each individual family member that they defamed—and that a defamatory statement must be directed at the plaintiff as an ascertainable person to be actionable. However,

---

[9] A bankruptcy court subsequently ruled that the judgment and sanctions orders against Scarbrough are nondischargeable debts. *In re Scarbrough*, 516 B.R. 897, 924 (Bankr. W.D. Tex. 2014), *aff'd*, *Scarbrough v. Purser*, 836 F.3d 447 (5th Cir. 2016).

when a group is named and the plaintiff is a readily identifiable member of the group, a cause of action for defamation exists if those who know and are acquainted with the plaintiff understand that the statement refers to the plaintiff. *See Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 651-52 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Sellards v. Express-News Corp.*, 702 S.W.2d 677, 680 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); *see also McGregor v. Vela*, No. 03-01-00299-CV, 2002 Tex. App. LEXIS 1131, at *12 (Tex. App.—Austin Feb. 14, 2002, no pet.) (not designated for publication) ("Publication does not require that the plaintiff be named, if those who know the plaintiff and are acquainted with him understand that the defamatory publication referred to him.").

Here, Elizabeth testified that Bill Cooke, a justice of the peace in Killeen, told the Purser Family that Scarbrough had accused them of Purser Sr.'s murder. Cooke plainly understood who Scarbrough was referring to when he accused the Purser Family of murder. Scarbrough himself testified that he reported to the funeral home director Dan Carter, the Temple Police Department and the Texas Rangers his accusation that the Purser Family had murdered their husband and father. Scarbrough's murder accusations against the Purser Family included Purser Sr.'s daughter-in-law, JoAnn. Scarbrough referred to the incident in which JoAnn struggled with Purser Sr. in the truck outside Deaton's house as "evidence" supporting his accusation that JoAnn murdered her father-in-law.

Under these facts, there was no misunderstanding that Scarbrough's defamatory statements were directed at each of the Purser Family appellees. *See Levine*, 448 S.W.3d at 651-52. As to Steele and Deaton, the jury heard the recording of the women telling Purser Sr. that his family could not be trusted and wanted to institutionalize him or put him in a home because they wanted

10

his money. The women referenced Purser Sr.'s wife, his children, and his daughter-in-law when making these statements. We overrule appellants' complaint that none of the defamatory statements on which the jury assessed liability identified any member of the Purser Family individually.

## B. Publication of defamatory or false statement

As we have noted, none of the appellants challenge the jury's finding that they each made statements that were defamatory and false. However, appellants contend that there is no evidence that their defamatory statements about the Purser Family were published. "Publication of defamatory words means to communicate the words, either orally, in writing, or in print, to a third person capable of understanding their defamatory import and in such a way that the third person would understand." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.). The instruction on publication in the charge required communication to a person—other than the appellees—who is capable of understanding its meaning.

As to Scarbrough's statements, the jury heard Scarbrough himself testify that he told the Texas Rangers, the Temple Police Department, and Dan Carter, the director of the funeral home where Scarbrough's arrangements were being made, about his accusation that the Purser Family had murdered Purser Sr. Elizabeth testified that Bill Cooke, a justice of the peace in Killeen, told the Purser Family that Scarbrough had accused them of Purser Sr.'s murder. The jury heard the recording of Scarbrough talking to Carolyn Bolling—a nonparty to the suit and niece of Purser Sr.—in which Scarbrough claimed that he represented Purser Sr. and stated that Purser Sr.'s family intentionally misled doctors and caused his death.

11

As to Steele and Deaton, the jury heard the recording of the women telling Purser Sr.—a person other than the appellees—that his family could not be trusted and wanted to institutionalize him or put him in a home because they wanted his money, causing Purser Sr. to become very suspicious of his family members. Appellants' contention that there is "no evidence" that any defamatory or false statements about the Purser Family were published is not supported by this record as the evidence shows the statements were made to Purser Sr. We overrule appellants' complaint that none of their defamatory statements were published.

## C. Clear-and-convincing evidence that Scarbrough committed defamation per se

The jury found that Scarbrough, in lodging his accusations against the Purser Family, committed defamation per se. Scarbrough contends that there is no clear-and-convincing evidence that he made any statement that a witness perceived as tending to affect a person injuriously or charging a person with illegal or immoral conduct. A false accusation of the commission of a criminal act is defamatory per se. *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984).

Here, the jury's affirmative finding of defamation per se against Scarbrough is supported by Scarbrough's own testimony. He acknowledged his statements to Dan Carter accusing the Purser Family of murdering Purser Sr. by overdosing him with drugs. Scarbrough also testified that nothing in the record from any medical professional stated that the Purser Family was providing Purser Sr. too much medication, that he had no direct causation evidence of the Purser Family's involvement with Purser Sr.'s demise, and that he had no opinion from an expert medical professional supporting his suspicion that the family had anything to do with Purser Sr.'s demise.

12

The jury also heard Scarbrough's recorded conversation with Carolyn Bolling, the Pursers' niece, in which Scarbrough accused the Purser Family of Purser Sr.'s murder. Finally, the jury heard the testimony of Dr. Sharon L. Barber, M.D., who treated Purser Sr. during his last hospitalization and stated that she saw no signs that Purser Sr. was abused or neglected, that he had been cared for "[e]xceptionally well" by family members and a caregiver who was present twenty-four hours a day, and that there was no indication that Scarbrough was correct in his accusation about the Purser Family having murdered Purser Sr. This evidence was sufficient to produce in the minds of the jury a firm belief or conviction as to the truth of the Purser Family's allegations—that Scarbrough committed defamation per se by falsely accusing the Purser Family of committing the crime of murder. Further, there is no argument that the murder accusations Scarbrough communicated to Carter and Bolling were in any way privileged.[10] We overrule Scarbrough's complaint that there is no clear-and-convincing evidence of his committing defamation per se.

## D. No immunity from defamation for Scarbrough's report to Adult Protective Services

Scarbrough contends that he was entitled to statutory immunity for his report to Adult Protective Services that Purser Sr. was a victim of elder abuse. However, the record contains a letter from the Texas Department of Family and Protective Services stating its finding that "the allegations of Exploitation and Physical Abuse" of Purser Sr. "were **INVALID**." The Department also stated that "[a]ll allegations have been investigated and APS has no concerns at this time."

---

[10] Scarbrough contends for the first time in his post-submission briefing that his statements about Purser Sr. were protected by "litigation immunity" because, as a pro se defendant, he had an attorney-client relationship with himself. That contention is novel but waived. *See Romero v. State*, 927 S.W.2d 632, 634 n.2 (Tex. 1996) (concluding that argument raised for first time in post-submission briefing was waived); *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 340 n.4 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (same).

The Texas Human Resources Code requires a report if there is "cause to believe" that an elderly person is in the state of abuse, neglect, or exploitation. Tex. Hum. Res. Code § 48.051(a). The statute includes an affirmative defense providing protection for such reports unless they are made in bad faith or with malice. *Id*. § 48.054(a) ("A person filing a report under this chapter or testifying or otherwise participating in any judicial proceeding arising from a petition, report, or investigation is immune from civil or criminal liability on account of his or her petition, report, testimony, or participation, unless the person acted in bad faith or with a malicious purpose."); *see Miranda v. Byles*, 390 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (concluding that similar protection in section 261.106 of Texas Family Code for reporting child abuse is affirmative defense); *Howard v. White*, No. 05-01-01036-CV, 2002 Tex. App. LEXIS 4891, at *18-20 (Tex. App.—Dallas July 10, 2002, no pet.) (not designated for publication) (concluding that appellant was not entitled to statutory protection from defamation claims based on her report of child abuse because she failed to prove that her report was made in good faith).

In raising statutory immunity as an affirmative defense, Scarbrough had the burden of showing that he was not acting "in bad faith or with a malicious purpose"—i.e., in good faith—when he made his report of elder abuse. *See* Tex. Hum. Res. Code § 48.054(a); *Byles*, 390 S.W.3d at 552; *Howard*, 2002 Tex. App. LEXIS 4891, at *18-20. Scarbrough failed to meet that burden. He contends that "there was no evidence that [he] knew that Mr. Purser *was not* in trouble." (Emphasis added.). But that contention impermissibly shifts the burden of proof for his affirmative defense and is no evidence of his good faith. Further, Scarbrough admitted in his September 26, 2011 deposition that he had not seen Purser Sr. for about five months before making the report and that

14

his report was based on a remark from David Pace, his process server, who allegedly told him that Purser Sr. "was in real poor condition." Scarbrough testified:

> after David told me that, I was really shocked. And I was saddened. And I called the Adult Protective Service, which is a State agency that has the job of overseeing—protecting elderly people and adults. I called them . . . And I reported it to them. . . . I reported that Mr. Purser was doing very poorly, according to my process server, and that he seemed inappropriate—untimely for me—to me that he would be acting or feeling that bad. And then I asked them to look into it or told them about it.

Information in Pace's alleged remark provided Scarbrough no "cause to believe" that the Purser Family was abusing and exploiting Purser Sr., as Scarbrough reported to the Texas Department of Family and Protective Services, and Scarbrough testified about no other basis for his report. *See* Tex. Hum. Res. Code § 48.051(a). With no showing of good faith, we overrule Scarbrough's complaint that he was entitled to statutory immunity for his report of elder abuse.

**E. Scarbrough was not entitled to his requested qualified-immunity instruction**

Scarbrough contends that the district court erred by denying his requested question and instruction on qualified immunity for actions taken in his capacity as a lawyer for Steele and Deaton during his investigation and defense of the case including, in his view, the defamatory statements he made against the Purser Family. We review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). Omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *Id.*

15

Scarbrough's requested instruction stated, "Attorneys have qualified immunity from a suit arising from their discretionary duties in and out of the courtroom in good faith within the scope of their legal representation of respected [sic] clients." This proposed instruction required a "good faith" element that was negated by the jury's finding that Scarbrough acted maliciously or with conscious indifference toward the Purser Family.[11] Thus, the court's declining to submit the instruction as worded was harmless. *See id.* at 580 (holding that omission of instruction was harmless because jury's answer to submitted question negated unsubmitted issue); *Laughman v. Sun Pipe Line Co.*, 114 S.W. 451, 453 (Tex. Civ. App.—Galveston 1908, no writ) (concluding that any error in omitting issue from charge would be harmless where jury's verdict against appellants on issues that were submitted necessarily includes finding against appellants on omitted issue); *see also James v. Easton*, 368 S.W.3d 799, 803 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("An attorney generally has immunity from claims by an opposing party based upon conduct the attorney undertook in the representation of a client, but this immunity does not apply to alleged torts based upon the attorney's fraudulent or malicious conduct."); *McGregor*, 2002 Tex. App. LEXIS 1131, at *15-16 ("Because the jury found that the communication was made with actual malice, McGregor's claim of qualified privilege would have failed even if the jury had found that the privilege applied."). We overrule Scarbrough's complaint that the court refused his requested qualified-immunity instruction.

---

[11] That finding was supported by legally sufficient evidence, as we note later in our discussion.

16

**F. Defamation damages**

The jury was instructed, without objection, that they could award damages if they found defamation committed by any appellant or defamation per se committed by Scarbrough. The jury found that all three appellants committed defamation and that Scarbrough also committed defamation per se. Based on these findings, the jury awarded the Purser Family damages for injury to reputation in the past and future and for mental anguish in the past and future. Appellants do not challenge the jury's awards to the Purser Family for past mental anguish. In fact, their briefing concedes that "[t]he record is replete with evidence of past damages."

For injury to reputation, the jury awarded the Purser Family the following damages:

| HELEN | Steele | Deaton | Scarbrough |
|---|---|---|---|
| past reputation | $25,000 | $25,000 | $150,000 |
| future reputation | $25,000 | $25,000 | $150,000 |

| SUE | Steele | Deaton | Scarbrough |
|---|---|---|---|
| past reputation | $25,000 | $25,000 | $50,000 |
| future reputation | $30,000 | $25,000 | $50,000 |

| PURSER JR. | Steele | Deaton | Scarbrough |
|---|---|---|---|
| past reputation | $25,000 | $25,000 | $150,000 |
| future reputation | $25,000 | $25,000 | $150,000 |

| JOANN | Steele | Deaton | Scarbrough |
|---|---|---|---|
| past reputation | $25,000 | $50,000 | $150,000 |
| future reputation | $25,000 | $25,000 | $150,000 |

17

| ELIZABETH | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **past reputation** | 0 | 0 | $150,000 |
| **future reputation** | 0 | 0 | $150,000 |

Appellants contend that there is no evidence that the Purser Family sustained any injury to their reputations in the past and no evidence that they will likely sustain injury to their reputations in the future. We agree that there was no evidence that the defamatory statements by Steele and Deaton, consisting of their statements to Purser Sr., caused injury to the Purser Family's reputations in the past or future, and we sustain their issue.

As to Scarbrough's statements that were defamatory per se—accusing the family of elder abuse and murder—evidence of injury to reputation was unnecessary. Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages, including loss of reputation and mental anguish. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). However, that presumption yields only nominal damages. *Id.* The Texas Supreme Court has instructed that beyond nominal damages, presumed damages are reviewed for evidentiary support.[12] *Id.* Nominal damages, such as $1, are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages. *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013). In defamation per se cases, nominal damages are awarded when there is no proof of serious harm resulting from the defendant's attack on the plaintiff's character and reputation or when they are the only damages claimed, and the action is

---

[12] Appellants do not challenge the amounts the jury awarded as damages for defamation, i.e., for injury to reputation and mental anguish.

brought to vindicate the plaintiff's character through a jury verdict establishing the falsity of the defamatory matter. *Id*.

Here, because the jury awarded more than nominal damages as to defamation per se, there must be legally sufficient evidence to support the jury's findings of damage to the Purser Family members' reputations in the past and future. *See Burbage*, 447 S.W.3d at 259. When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it, disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). To prevail, an appellant must show that no more than a scintilla of evidence supports a finding on which the opponent had the burden of proof. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc*., 434 S.W.3d 142, 156-57 (Tex. 2014); *City of Keller*, 168 S.W.3d at 826. More than a scintilla of evidence exists to support a finding when the evidence enables reasonable and fair-minded people to differ in their conclusions. *Gharda USA, Inc. v. Control Sols., Inc*., 464 S.W.3d 338, 347 (Tex. 2015). We may not substitute our judgment for that of the jury when the evidence falls within the zone of reasonable disagreement, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 816-17, 819-20, 822.

### 1. No evidence supporting injury to reputation

The Texas Supreme Court has cautioned that in defamation cases our review of a jury's discretionary damage awards remains important to protect free speech, and we must ensure that noneconomic damages are not simply disguised disapproval of defendants, but compensation

19

for actual injuries. *Burbage*, 447 S.W.3d at 259. In *Burbage*, the Court noted that while some evidence suggested community awareness and discussion of the defamatory statements, there was only vague testimony about the actual impact of the defamation, the basis for which the damage award compensated. *Id*. at 262.

Similarly here, despite the appalling nature of Scarbrough's assertions, we conclude that there was no evidence supporting the jury's findings of injury to the Purser Family's reputations in the past and future. The evidence at trial did not demonstrate the actual impact of the defamation on the Purser Family that would meet the *Burbage* standard. *See id.* We sustain Scarbrough's complaint that there is no evidence his defamatory statements caused the Purser Family to sustain injury to their reputations in the past and no evidence that they will likely sustain injury to their reputations in the future.

**2. No evidence supporting damage amounts for future mental anguish**

The jury also awarded the Purser Family damages for mental anguish in the past and future on their defamation claims. As noted above, the jury's awards for mental anguish in the past, which total $1,060,000, will stand and none of the appellants challenge them.[13] However, appellants do contend that there is no evidence to support the jury's award based on the Purser Family suffering

---

[13] Appellants complain that the Purser Family did not segregate "mental disturbances" they sustained as a result of Purser Sr.'s death from "mental disturbances" caused by the appellants' acts. However, it was appellants' burden to object if they perceived that a broad-form damages question mixed valid and invalid elements of damages. *See Burbage v. Burbage*, 447 S.W.3d 249, 255-56 (Tex. 2014). Appellants' failure to make that objection below waives this complaint. Even if it were preserved, appellants acknowledge that no Texas court has required such a segregation of mental-anguish damages.

mental anguish in the future. The jury awarded the following damages to the Purser Family for future mental anguish:

| HELEN | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **future mental anguish** | $25,000 | $25,000 | $150,000 |

| SUE | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **future mental anguish** | $25,000 | $25,000 | $50,000 |

| PURSER JR. | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **future mental anguish** | $25,000 | $25,000 | $150,000 |

| JOANN | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **future mental anguish** | $25,000 | $25,000 | $150,000 |

| ELIZABETH | Steele | Deaton | Scarbrough |
|---|---|---|---|
| **future mental anguish** | $25,000 | $25,000 | $150,000 |

Because the jury awarded more than nominal damages, there must be legally sufficient evidence to support the jury's findings of the Purser Family members' future mental anguish. *See id.* at 259. To support an award for future mental anguish, a plaintiff must demonstrate a reasonable probability of suffering compensable mental anguish in the future. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008). Mental anguish is compensable only if it causes a substantial disruption in daily routine or a high degree of mental pain and distress. *Hancock*, 400 S.W.3d at 68. Evidence of the nature, duration, and severity of the mental anguish is required. *Id*. A plaintiff's evidence of continuing depression, humiliation, sleeplessness, headaches, and detrimental effects on daily

21

activities and relationships can be legally sufficient to support an award of damages for future mental anguish. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006). Mental anguish awards are noneconomic damages that must be compensation for actual injuries and not simply a disguised disapproval of the defendant. *Burbage*, 447 S.W.3d at 259.

We conclude that the evidence at trial did not show demonstrate a reasonable probability that appellants' defamatory statements would cause the Purser Family to suffer compensable future mental anguish—i.e, a substantial disruption in daily routine or a high degree of mental pain and distress. *See Adams*, 265 S.W.3d at 917. We sustain appellants' complaint that there is no evidence to support the jury's award of damages for the Purser Family's suffering of mental anguish in the future.

## II.  Fraud issues

The jury found that each of the appellants committed fraud against Helen, Purser Sr.'s widow, in two ways:  (1) fraud by misrepresentation and (2) fraud by failure to disclose.

### A.  Steele and Deaton waived fraud-by-failure-to-disclose issue

Steele and Deaton waived their issue regarding the jury's finding of "fraud by failure to disclose" by wholly omitting any briefing of it. *See* Tex. R. App. P. 38.1(i). The jury was instructed without objection that they could award damages based on a "Yes" answer for either the "fraud by misrepresentation" or "fraud by failure to disclose" theory. But Steele and Deaton failed to address the fraud-by-failure-to-disclose theory, which was an independent basis supporting the jury's answer to the fraud question. Thus, the liability finding against Steele and Deaton for fraud is unchallenged and must stand.

22

**B. No evidence of Scarbrough's fraud by misrepresentation or failure to disclose**

Scarbrough contends that there is no evidence supporting the jury's finding that he committed fraud by misrepresentation against Helen because there is no evidence he ever said anything to her. The charge instructed the jury that "fraud by misrepresentation" occurs when:

(A)     a party makes a material misrepresentation,

(B)     the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

(C)     the misrepresentation is made with the intention that it should be acted on by the other party, and

(D)     the other party acts in reliance on the representation and thereby suffers injury.

We agree that there was no evidence at trial of Scarbrough saying anything directly to Helen, or that he made any misrepresentation to her. To the extent that the misrepresentation at issue here was the existence of the tape-recorded statements during litigation, that issue is covered in the sanctions analysis below. We sustain Scarbrough's complaint that there is no evidence supporting the jury's finding that he committed fraud by misrepresentation against Helen.

Scarbrough further contends that there is no evidence supporting the jury's finding that he committed fraud by failure to disclose against Helen. The charge instructed the jury that "fraud by failure to disclose" occurs when:

(A)     a party fails to disclose a material fact within the knowledge of that party,

(B)     the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

23

(C)     the party intends to induce the other party to take some action by failing to disclose the fact, and

(D)     the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Scarbrough contends there is no evidence that as opposing counsel for Steele and Deaton (or later as a defendant) he had a duty to disclose anything to Helen. Scarbrough notes that there is no private right of action for violation of the Texas attorney disciplinary rules, thus, any failure to produce witness-statement recordings in discovery was not a "failure to disclose" that would support Helen's fraud claim against him. *See Jones v. Blume*, 196 S.W.3d 440, 450 (Tex. App.—Dallas 2006, pet. denied). He also notes that there is no cause of action for "fraud on the community" based on any fraudulent transfer of marital assets in this context, which does not involve a divorce or probate suit. *Cf. Chu v. Hong*, 249 S.W.3d 441, 445 (Tex. 2008); *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998). We agree that there was no evidence at trial that Scarbrough had a duty to disclose anything to Helen independent of her complaints about his discovery abuse, which were addressed by sanctions. We sustain Scarbrough's complaint that there is no evidence supporting the jury's finding that he committed fraud by failure to disclose against Helen.

## C. Fraud damages

Based on its finding of fraud, the jury awarded Helen damages for loss of community property and mental anguish (problematically, the jury was not asked to answer with amounts as to each appellant):

|  | loss of community property | past mental anguish | future mental anguish |
|---|---|---|---|
| HELEN | $1.5 million | $500,000 | $250,000 |

Appellants challenge the sufficiency of the evidence to support the jury's findings of loss of community property and mental anguish, contending that there is no evidence that Helen sustained these damages due to any fraud by appellants.

Based on our conclusion that there is insufficient evidence supporting the fraud claim against Scarbrough, the fraud damages for loss of community property and mental anguish against him cannot stand.

As to Steele and Deaton, although they failed to brief the issue of liability, there is no evidence of any damages resulting from alleged fraud had they committed it, thus there are no fraud damages for loss of community property and mental anguish. While Steele and Deaton appear to have taken advantage of Purser Sr., the evidence is not sufficient to prove the elements of fraud. We sustain Steele's and Deaton's complaint that there is no evidence supporting the jury's damage findings of loss of community property and mental anguish based on fraud.[14]

### III. Conspiracy issues on defamation and fraud

**No evidence of conspiracy**

The jury found that appellants were part of a conspiracy that damaged Helen Purser. Appellants contend that there was no evidence of conspiracy because there was "no evidence of any

---

[14] Based on our resolution of the fraud issue, we need not address appellants' contention that there was no evidence that they acted in concert with one another in committing fraud.

underlying tort." However, as we have noted, none of the appellants challenged the jury's finding that they each made statements that were defamatory and false (they argued only that their statements did not name specific individuals, were not published, and were not defamatory per se). Thus, the underlying torts of defamation and defamation per se—for which the jury made an unchallenged award of past mental anguish damages—survive this appeal.

The conspiracy question in the charge (conditioned on a finding of defamation, defamation per se, or fraud) instructed the jury that:

> To be part of a conspiracy, more than one person must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Helen Purser. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.
> Each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.

Although appellants do not challenge the jury's finding that they made false and defamatory statements, the evidence showed that Steele and Deaton made their defamatory statements in a recording with Purser Sr. around May 2010, before they met Scarbrough, and that Scarbrough made his defamatory statements after Purser Sr.'s death in July 2011. Neither the evidence nor the timing of their statements supports a finding that when the statements were made, appellants had a common objective to commit defamation. We sustain appellants' issue that there was no evidence of conspiracy.[15]

---

[15] Based on our resolution of this issue, we need not address appellants' contention that there was no evidence that they acted in concert with one another in committing defamation.

# IV. Exemplary damages issues

## A. Malice or gross negligence

The jury found that the harm to the Purser Family resulted from malice or gross negligence. Appellants contend that there is no clear-and-convincing proof supporting the jury's finding. The jury was instructed to answer the question on malice or gross negligence only if they unanimously answered "Yes" to the questions on defamation, defamation per se, or fraud. The charge defined "clear and convincing evidence," "malice," and "gross negligence":

> "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.
>
> "Malice" means a specific intent by Melissa Deaton, Denise Steele or Jerry Scarbrough, to cause substantial injury or harm to Helen Purser, Sue Van Zanten, Gary "Bubba" Purser, Jr., JoAnn Purser, or Elizabeth Tipton.
>
> "Gross negligence" means an act or omission by Melissa Deaton, Denise Steele or Jerry Scarbrough,
>
> (a)    which when viewed objectively from the standpoint of Melissa Deaton, Denise Steele or Jerry Scarbrough at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (b)    of which Melissa Deaton, Denise Steele or Jerry Scarbrough has actual subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*See* Tex. Civ. Prac. & Rem. Code §§ 41.001 (defining "clear and convincing," "malice," and "gross negligence"), 41.003 (setting forth standards for recovery of exemplary damages). Because we have already sustained appellants' no-evidence issues as to the jury's damage awards for injury to reputation (past and future) and for future mental anguish, what remains are the unchallenged awards

27

on the defamation claims for past mental anguish. Exemplary damages based on these awards could have been supported if the Purser Family showed by clear-and-convincing evidence that the harm from appellants' defamatory statements was the result of gross negligence or malice. *See Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 331 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also* Tex. Civ. Prac. & Rem. Code § 41.003(a). A defendant's repetition of false and defamatory accusations about plaintiff's "dishonest, unethical, and illegal behavior" can show "specific intent to injure" and support a jury's finding of malice. *Pitts*, 369 S.W.3d at 331.

### 1. Steele and Deaton waived issue of gross negligence

Here, the jury made the unchallenged finding that Steele and Deaton made statements about the Purser Family that were false and defamatory. The statements included telling Purser Sr. that he could not trust his family, that his family was after his money, and that his family wanted him institutionalized. Steele and Deaton waived any issue as to whether there was clear-and-convincing evidence that they made these defamatory statements with gross negligence by failing to brief this issue. *See* Tex. R. App. P. 38.1(i). The jury was asked whether the harm to the Purser Family resulted from malice or gross negligence. But on appeal, Steele and Deaton failed to brief any issue as to gross negligence, which was an independent basis for the awards of exemplary damages against them. Thus the jury's finding of gross negligence against Steele and Deaton is unchallenged and must stand.

### 2. Clear-and-convincing evidence of Scarbrough's malice

As to Scarbrough, the evidence supports the jury's finding of malice because he showed a "specific intent to injure" through his repeated false and defamatory statements accusing

28

the Purser Family of elder abuse and murder. *Cf. Pitts*, 369 S.W.3d at 331. The jury heard deposition testimony from Scarbrough about his murder accusations and a recording of a phone call to Carolyn Bolling that Scarbrough made two months after his deposition. In the recording—after stating that he represented Purser Sr.—Scarbrough told her that the Purser Family abused Purser Sr., intentionally misled his doctors, and caused his death.

Scarbrough's testimony showed that he persisted in making accusations that Purser Sr. did not have dementia and was murdered by his family despite a lack of evidence and even Scarbrough's own admission that he had no medical evidence or medical-expert opinion to support those accusations. And long before he made his accusations to the Pursers' niece, a funeral director, and law enforcement, Scarbrough accidentally recorded himself admitting to his wife that Purser Sr. had dementia. In addition to that recorded admission, the jury heard Scarbrough acknowledge during his deposition that Purser Sr. had been diagnosed by his doctors with dementia. The jury also heard that Scarbrough propounded interrogatories to the deceased Purser Sr.—more than a month after Purser Sr.'s death and knowing Purser Sr. was deceased—asking about Purser Sr.'s sexual activities and affairs, and that Scarbrough questioned Helen in a lengthy deposition—held just two months after her husband's death—about irrelevant matters such as her medical history and private intimacies with Purser Sr. The jury further heard Scarbough's statement to his wife, which he inadvertently recorded, discussing certain Purser Family members and stating his intent to get "a million dollars from every one of those sons of bitches" in the lawsuit.

The evidence at trial, viewed in the light most favorable to the jury's finding of malice, shows that Scarbrough chose to defame the Purser Family with repeated murder accusations and attempted to obtain an autopsy to "disprove" Purser Sr. had dementia, despite Scarbrough's own

29

opinion that Purser Sr. suffered from that condition. The evidence is sufficient to support the jury's finding of Scarbrough's willfulness, and not that Scarbrough had a good-faith belief in his statements. Further, the evidence was sufficient to produce in the minds of the jury a firm belief or conviction as to the truth of the allegations of malice—that Scarbrough, by making repeated accusations of illegal behavior against the Purser Family, had a specific intent to cause substantial injury or harm to them. *See id.* We overrule Scarbrough's complaint that there is no clear-and-convincing proof that he made his defamatory statements with malice.

## B. Exemplary damage awards

The jury unanimously awarded these exemplary damages:

| HELEN | **Steele** | **Deaton** | **Scarbrough** |
|---|---|---|---|
| **exemplary damages** | $1.5 million | $500,000 | $2 million |

| SUE | **Steele** | **Deaton** | **Scarbrough** |
|---|---|---|---|
| **exemplary damages** | $500,000 | $250,000 | $1 million |

| PURSER JR. | **Steele** | **Deaton** | **Scarbrough** |
|---|---|---|---|
| **exemplary damages** | $500,000 | $500,000 | $2 million |

| JOANN | **Steele** | **Deaton** | **Scarbrough** |
|---|---|---|---|
| **exemplary damages** | $500,000 | $500,000 | $2 million |

| ELIZABETH | **Steele** | **Deaton** | **Scarbrough** |
|---|---|---|---|
| **exemplary damages** | $500,000 | $250,000 | $1 million |

In determining what amount of exemplary damages to award against appellants, if any, the jury was instructed to consider:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of Melissa Deaton, Denise Steele, or Jerry Scarbrough;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of Melissa Deaton, Denise Steele, or Jerry Scarbrough.

*See* Tex. Civ. Prac. & Rem. Code § 41.011(a) (setting forth evidence factfinder should consider in determining amount of exemplary damages award); *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 238 (Tex. 2011) (noting these statutory factors); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) (providing analysis of first five factors).

### 1. Net worth

Scarbrough, Steele, and Deaton contend that the jury's award of exemplary damages is excessive and unconstitutional because "[i]f a judgment is so large, in relation to a party's net worth, that it is impossible to pay, and it converts the proceeding into a criminal proceeding, wherein the party is subject to being in jail for an interminable time due to inability to pay." They cited no authority in support of this contention.[16]

---

[16] Scarbrough contends that he has a "negative" net worth. However, there was no evidence at trial of his negative net worth.

31

While evidence of net worth is one factor that the jury considers in its determination of the proper amount of exemplary damages, introduction of such evidence is not mandatory. *Barnhart v. Morales*, 459 S.W.3d 733, 751-52 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Durban v. Guajardo*, 79 S.W.3d 198, 210-11 (Tex. App.—Dallas 2002, no pet.)). Parties may discover and offer evidence of a defendant's net worth in cases in which punitive or exemplary damages may be awarded, *Lunsford v. Morris*, 746 S.W.2d 471, 472 (Tex. 1988), but a jury is not required to consider evidence of a defendant's net worth before imposing exemplary damages, *Barnhart*, 459 S.W.3d at 752. Because evidence of a defendant's net worth is not a prerequisite to a jury's imposition of exemplary damages, we conclude that this factor was not determinative of the awards of exemplary damages against Scarbrough, Steele, and Deaton. *See Barnhart*, 459 S.W.3d at 752.

**2. Excessiveness**

Scarbrough, Steele, and Deaton also contend generally that courts "must consider a punishment that would deter and punish without being gratuitously excessive." *Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 Tex. App. LEXIS 9213, at *13 (Tex. App.—Austin Nov. 18, 2010, no pet.) (mem. op. on remand); *see also Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004) ("Ideally, the court of appeals should automatically reevaluate exemplary damages whenever compensatory damages are reduced."). The Texas Supreme Court has stated that exemplary damages should be "reasonably proportioned to actual damages" and provided the five factors in *Alamo National Bank v. Kraus* for courts to consider in determining the reasonableness of an award of exemplary damages. *Dillard Dep't Stores v. Silva*, 148 S.W.3d 370, 373 (Tex. 2004) (citing *Kraus*, 616 S.W.2d at 910). In addition to net worth (which we have addressed above), the charge instructed the jury to consider

the five *Kraus* factors: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of appellants' culpability; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety.

### A. *Kraus* factors as to Scarbrough

As to Scarbrough, the wrong was his false and defamatory murder accusation. The jury found by clear-and-convincing evidence that the character of Scarbrough's conduct was malicious and as part of its finding, that Scarbrough had a high degree of culpability based on his "specific intent" to cause substantial injury or harm to the Purser Family. We have concluded that the evidence, detailed above, was sufficient to support that finding. The evidence at trial on the next factor, the situation and sensibilities of the parties, also supports the jury's award of exemplary damages. The Purser Family, having endured the loss of Purser Sr., then had to deal with the humiliation of being falsely and repeatedly accused by Scarbrough of causing Purser Sr.'s death. Scarbrough's own briefing concedes that this record is "replete with evidence of past damages" that the Purser Family sustained based on defamation. Finally, regarding the last factor, we conclude that Scarbrough's repeatedly making false and defamatory murder accusations against the Purser Family in this case "offends a public sense of justice and propriety." Scarbrough claimed to have made his accusations in an attempt to obtain an autopsy on Purser Sr. "disproving" his dementia. But Scarbrough believed, as he told his wife, that Purser Sr. had dementia. No medical evidence or expert supported Scarbrough's murder accusations, and Scarbrough admitted in his deposition that Purser Sr. had been diagnosed by his doctors with dementia. Further, Scarbrough told Purser's niece four months after Purser Sr. died—when an autopsy was unlikely—that the Purser Family abused Purser Sr., intentionally misled his doctors, and caused his death.

33

A rational jury could have found that Scarbrough's repeated defamation of the Purser Family was not designed to obtain an autopsy disproving Purser Sr.'s dementia, but rather to leverage his position in the underlying lawsuit. The jury heard Scarbrough admit that he made his accusations of abuse and exploitation to Adult Protective Services while he was representing Deaton and seeking a substantial sum of money from Purser Family members. The jury also heard Scarbrough's statement to his wife, which he inadvertently recorded, about his intent to get "a million dollars from every one of those sons of bitches."[17]

**B. *Kraus* factors as to Steele and Deaton**

As to Steele and Deaton, the wrong was their defamation of the Purser Family in communicating to Purser Sr. Steele and Deaton told Purser Sr. that his family was after his money, that his family wanted him institutionalized, and that his family could not be trusted. Steele and Deaton have not challenged the jury's finding by clear-and-convincing evidence that their false and defamatory statements were made with gross negligence. Further, there was sufficient evidence at trial concerning the nature and character of Steele's and Deaton's conduct—i.e., defaming the Purser Family to Purser Sr. to secure further financial gain—and the high degree of Steele's and Deaton's culpability for that conduct to support the jury's award of exemplary damages. The evidence at trial on the next factor, the situations and sensibilities of the parties, also supports the jury's award of

---

[17] The record shows that Scarbrough engaged in other conduct offensive to a public sense of justice and propriety, including: (1) his propounding interrogatories to the deceased Purser Sr.—more than a month after Purser Sr.'s death and knowing Purser Sr. was deceased—asking about Purser Sr.'s sexual activities and affairs; and (2) his questioning of Helen—in a lengthy deposition held just two months after her husband's death—about irrelevant matters such as her medical history and private intimacies with Purser Sr.

exemplary damages. The jury had sufficient evidence to find that the situation and sensibilities of the parties involved Steele's and Deaton's receiving money from Purser Sr., who was alleged to be suffering from dementia, planning of further financial gain through a real-estate development scheme that would net them $2.5 million each, and encouraging Purser Sr. to leave his money to them—meanwhile persuading him that his family members were the ones scheming against him. This evidence also supports the jury's findings that Steele's and Deaton's conduct of defaming the Purser Family to Purser Sr. to secure further financial gain "offended a public sense of justice and propriety."

### C. Statutory cap

In addition to the *Kraus* factors, we must consider application of the statutory cap on such awards in addressing Scarbrough's, Steele's, and Deaton's complaints about the excessiveness of the jury's exemplary-damages award. Decisions about whether exemplary damages should be awarded and the amount of exemplary damages awarded are reserved to the discretion of the trier of fact, Tex. Civ. Prac. & Rem. Code § 41.010(b), but an exemplary damage award may not exceed the cap set forth in section 41.008 of the Texas Civil Practice and Remedies Code, *id*. § 41.008(b). In the absence of certain types of criminal conduct not implicated here, section 41.008 limits an award of exemplary damages to the greater of:

(1) (A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

35

*Id*. § 41.008(b).

After reviewing the entire record, analyzing the evidence under the *Kraus* factors, considering the amount of compensatory damages, and applying the statutory cap, we conclude that exemplary damages are recoverable against Scarbrough, Steele, and Deaton. However, the exemplary-damage awards against them are excessive in light of the statutory cap in section 41.008(b).

As to Scarbrough, the jury awarded the Purser Family $8,000,000 in exemplary damages. Applying section 41.008 to the jury's unchallenged award of $700,000 in noneconomic damages for past mental anguish results in a maximum award of $700,000 in exemplary damages. *See id*. (authorizing award for greater of $200,000 or "an amount equal to any noneconomic damages found by the jury, not to exceed $750,000"). Because the $8,000,000 exemplary damages award against Scarbrough exceeds the statutory cap by $7,300,000, we modify the exemplary damage award to $700,000 to comply with the cap, and affirm the award as modified.

As to Steele, the jury awarded exemplary damages of $3,500,000. Applying section 41.008 to the jury's unchallenged award of $180,000 in noneconomic damages for past mental anguish results in a maximum award of $200,000 in exemplary damages. *See id*. (authorizing award for greater of $200,000 or "an amount equal to any noneconomic damages found by the jury, not to exceed $750,000"). Because the $3,500,000 exemplary damages award against Steele exceeds the statutory cap by $3,300,000, we modify the exemplary damage award to $200,000 to comply with the cap, and affirm the award as modified.

As to Deaton, the jury awarded exemplary damages of $2,000,000. Applying section 41.008 to the jury's unchallenged award of $180,000 in noneconomic damages for past mental

anguish results in a maximum award of $200,000 in exemplary damages. *See id.* (authorizing award for greater of $200,000 or "an amount equal to any noneconomic damages found by the jury, not to exceed $750,000"). Because the $2,000,000 exemplary damages award against Deaton exceeds the statutory cap by $1,800,000, we modify the exemplary damage award to $200,000 to comply with the cap, and affirm the award as modified.

## V. Spoliation and discovery-abuse sanctions issues

### A. Spoliation instruction as to Scarbrough

Scarbrough contends that the district court erred in giving a spoliation instruction against him regarding the digital recorder because there is no evidence that he failed to preserve the digital recorder or had a duty to preserve it when he returned it to Deaton. When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 822, 827. To prevail, an appellant must show that no more than a scintilla of evidence supports a finding on which the opponent had the burden of proof. *See Waste Mgmt. of Tex.*, 434 S.W.3d at 156-57; *City of Keller*, 168 S.W.3d at 826. More than a scintilla of evidence exists to support a finding when the evidence enables reasonable and fair-minded people to differ in their conclusions. *Gharda USA*, 464 S.W.3d at 347. We may not substitute our judgment for that of the jury when the evidence falls within the zone of reasonable disagreement, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 816-17, 819-20, 822.

37

We review a trial court's submission of a spoliation instruction to the jury for an abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). Under that standard, we will reverse only if the court acted "without regard for guiding rules or principles." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). Spoliation of evidence requires two affirmative findings from the trial court: (1) that the nonproducing party had a duty to preserve the evidence, and (2) that the nonproducing party breached its duty to preserve material and relevant evidence. *Aldridge*, 438 S.W.3d at 20. A spoliation instruction is an appropriate remedy when a party's spoliation of evidence is intentional. *Id*. at 24. Intentional spoliation "includes the concept of 'willful blindness,' which encompasses the scenario in which a party does not directly destroy evidence known to be relevant and discoverable, but nonetheless allows for its destruction." *Id*. at 24-25 (citing Andrew Hebl, *Spoliation of Electronically Stored Information, Good Faith, and Rule 37(e)*, 29 N. Ill. U. L. Rev. 79, 97-98 (2008)).

Because Scarbrough does not contend that the spoliation instruction was legally incorrect, we analyze the sufficiency of the evidence based on the charge given. *See Kia Motors Corp. v. Ruiz,* 432 S.W.3d 865, 875 (Tex. 2014). The charge stated:

> You are instructed that **Denise Steele, Melissa Deaton and Jerry Scarbrough** intentionally did not preserve or failed to produce the digital recorder when they knew or should have known that a claim had been filed and that the digital recorder in their possession or control would be material and relevant to that claim.
>
> Under such circumstances, the failure of **Denise Steele, Melissa Deaton and Jerry Scarbrough** to preserve or produce evidence within her or his control raises the presumption that if such evidence were produced, it would operate against Denise Steele, Melissa Deaton and Jerry Scarbrough.

38

Scarbrough does not dispute his knowledge that a claim had been filed by the Pursers and that discovery was ongoing. His contention is that he had no duty to preserve the recorder because the Pursers did not show that he knew or should have known that the recorder would have been "material and relevant to that claim."

Scarbrough acknowledged on the record at Deaton's third deposition that he had a duty to determine what was on the recorder. He knew that appellees had requested production of witness statements, and he stated that Deaton had produced the recorder to him shortly after her second deposition, representing to him that it contained a recording of a conversation that she and her sister Kathy Perdue had with Purser Sr., i.e., a recording with statements from two parties to the lawsuit (the "sister recording"). Deaton's recollection differed. In her second deposition, Deaton testified that she had given a tape recording to Scarbrough shortly before that deposition began[18] and that she could not remember what was on that recording: "I would have to relisten to it. I do not remember what all is on it." Scarbrough produced that recording and acknowledged that he had a duty to find out what was on "the tape" ("I think I have an obligation to my client and to you to see whether or not . . . there are recordings on there that are pertinent to this lawsuit that are not frivolous").[19] Scarbrough further said it was "absolutely true" that if a lawyer is holding onto evidence, he is charged with knowledge of what is in that evidence.

---

[18] Deaton changed her testimony in her third deposition, stating that she could not remember when she gave the recorder to Scarbrough.

[19] Deaton also identified a separate recording of Purser Sr. that was made at her request by her first attorney, John Redington. The "Redington recording" was not made with the digital recorder but on an analog (microcassette) recorder.

But the record shows that Scarbrough failed to perform any inquiry into how many recordings were on the device and "just assumed that there was one." He testified that having the recorder "sure would be helpful" and "it would be really great if we could find that recorder and see what, if anything, was on it." He never asked Steele, the owner of the device, about the recorder or any recordings she had previously made with it: "I don't know that Ms. Steele ever talked to me about it."[20] He never asked his IT tech, Shawn Richeson, how many files or recordings were on the device. But Richeson's January 11, 2011 billing states "7 individual audio files recovered from USB digital recorder and returned recorder to Jerry." Scarbrough testified that he paid Richeson.

Scarbrough did not ask Deaton to preserve the recorder when he returned it to her. Although the recorder was in good working condition, was not "cheap," and belonged to Steele, Deaton testified that sometime between March and April 2011 the recorder "either went to Goodwill or it went in my trash." Meanwhile, Scarbrough continued insisting that as far as he knew, he had produced everything appellees requested. For over six weeks between the time that Deaton told him that she had disposed of the recorder and the time of the first sanctions hearing, Scarbrough said nothing to opposing counsel about the lost recorder. When Scarbrough was asked what actions he took to preserve it, he testified that he asked Richeson to make a CD of it and that he wrote a letter to Deaton in July 2011 (after she had already disposed of it) asking her to preserve the recorder.

### 1. The recorder was material

Scarbrough contends that the recorder was duplicative of information already provided to appellees from Richeson's server and was not material. "Material evidence" has been

---

[20] This is consistent with Steele's testimony that she did not converse with Scarbrough about the recorder.

defined as "[e]vidence having some logical connection with the facts of the case or the legal issues presented." *Material Evidence*, Black's Law Dictionary 676 (10th ed. 2014). Contrary to Scarbrough's view, the recorder was material evidence and was not merely duplicative. No witness who had possession or control of the digital recorder confirmed that the recordings on Richeson's server duplicated everything that had been on the recorder. In fact, there was evidence suggesting files were deleted from the recorder. Steele testified that she had taped "several" real estate classes she was attending "on that particular recorder" and none of those recordings were included in what Richeson recovered from it. Another recording that was not among the files that Richeson recovered was one that Deaton testified she had made of Purser Sr. making a settlement offer to her to drop her counterclaims. Richeson testified that files could be deleted from the recorder, that it is possible to recover deleted files from the recorder, that he did not attempt to recover any deleted files because he was not asked to check for files that were deleted, and that determining what had been on the digital recorder required the recorder itself. Testimony about another claimed discrepancy came from Scarbrough, who stated that the CD that Richeson provided to him differed from the CD with the recordings provided to the appellees. Only with the recorder, Richeson said, could he confirm whether Scarbrough's CD contained all of the recordings that were recovered from the device. Based on this evidence, the trial court would not have abused its discretion in finding that the recorder was evidence that had a logical connection with the facts of or legal issues presented in the Purser Family's suit and Scarbrough knew or should have known the recorder was material.

### 2. The recorder was relevant

Scarbrough next contends that the recorder was not relevant. "Relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the

41

determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. If there is a logical connection either directly or by inference between the evidence and a fact to be proved, the evidence is relevant. *Clark v. Randalls Food*, 317 S.W.3d 351, 357 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The Purser Family's suit alleged in part that Scarbrough's clients Deaton and Steele initiated an inappropriate relationship with Purser Sr. and financially exploited him while he suffered from dementia. Portions of the recordings that Richeson obtained from the recorder depicted conversations between Deaton, Steele, and Purser Sr. supporting the Purser Family's allegations.

Based on the witness statements that were recovered from the recorder, all of the evidence presented during the three-day hearing, and reasonable inferences drawn from that evidence, the district court would not have abused its discretion in determining that evidence not recovered from the recorder before Deaton disposed of it was at least potentially relevant to the Purser Family's claims and that Scarbrough knew or should have known that the recorder was relevant. *See IQ Holdings, Inc. v. Stewart Title Guar. Co.*, 451 S.W.3d 861, 868 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (concluding that appellee's attorney had duty to preserve documents that were at least potentially relevant to appellant's claims against appellees); *Clark*, 317 S.W.3d at 357.

The evidence in this record, considered in the light most favorable to the trial court's ruling, contains more than a scintilla of evidence showing that Scarbrough knew or should have known that he had a duty to preserve the digital recorder, which was material and relevant to the lawsuit, and that he failed to do so. The evidence further shows that the district court's spoliation instruction was based on more than a scintilla of evidence that Scarbrough failed to preserve the

42

digital recorder and had a duty to preserve it when he returned it to Deaton. There is proof of Scarbrough's willful blindness as to the recorder, i.e., that he did not directly destroy evidence known to be relevant and discoverable, but nonetheless allowed for its destruction. *See Aldridge*, 438 S.W.3d at 24-25. Scarbrough avoided knowledge of what was on the digital recorder by failing to perform any inquiry into its contents, not even asking Steele, the owner of the recorder, or Richeson, who recovered the information for Scarbrough from the recorder, what recordings had been on it or recovered from it. Scarbrough knew from Deaton's deposition that the recorder contained statements from parties to the lawsuit (herself and Purser Sr.), and that she did not remember "what all was on it." Despite that testimony, Scarbrough "just assumed that there was one," choosing not to confirm whether other recorded statements might be on the device. Then while discovery was ongoing, Scarbrough returned the recorder not to its owner but to Deaton, saying nothing to her about preserving it until his letter months later, ultimately allowing for her disposal of it. Because this record disproves it, we overrule Scarbrough's complaint that "no evidence" supported the spoliation instruction.

## B. Sufficient evidence of recordings that were not produced

Scarbrough contends that there is no evidence that he destroyed evidence or that the Purser Family was deprived of evidence he was accused of spoliating. However, as previously discussed, there was evidence indicating that files were deleted from the recorder: Steele testified that real-estate classes she recorded were not among the files that Richeson recovered, and Deaton testified that her recording of a settlement offer that Purser Sr. made to her was not recovered either. As Richeson made clear, there is no way to determine what had been on the recorder, i.e., what evidence the Purser Family was deprived of, without the device itself. We overrule Scarbrough's

43

complaint that there is no evidence that he destroyed evidence or that the Purser Family was deprived of evidence he was accused of spoliating.

## C. Discovery-abuse sanctions against Scarbrough

In five separate orders, the district court awarded Helen monetary sanctions totaling $54,261.50 for Scarbrough's discovery abuse, pursuant to the court's inherent authority and Texas Rule of Civil Procedure 215. Scarbrough's final set of issues challenges the imposition of sanctions against him in three of those orders, which imposed sanctions of $25,000, $15,959.50, and $11,000.[21] Scarbrough contends: (1) sanctions imposed for failure to produce all the requested recordings were not "just"; (2) sanctions imposed for disclosure of Purser's medical records were not "just" and his disclosure to Bolling was minimal and inconsequential; and (3) the Purser Family lacked standing to request sanctions for disclosure of Purser Sr.'s medical records.

A trial court may impose sanctions on any party that abuses the discovery process in seeking, making, or resisting discovery. *See* Tex. R. Civ. P. 215.3; *Wein v. Sherman*, No. 03-10-00499-CV, 2013 Tex. App. LEXIS 10666, at *39 (Tex. App.—Austin Aug. 23, 2013, no pet.) (mem. op.) (noting that Rule 215 sanctions are not damages for harm alleged in underlying lawsuit but are used to punish parties who violate discovery rules). A trial court also has inherent power to sanction to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *IFC Credit Corp. v. Specialty Optical Sys., Inc.*, 252 S.W.3d 761, 772 (Tex. App.—Dallas 2008, pet. denied) (citing *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex.

---

[21] Scarbrough failed to brief and has waived any challenge to two other sanctions orders: (1) an order imposing sanctions of $1,150 against him for filing a frivolous motion for sanctions, and (2) an order imposing sanctions of $1,152 against him for filing a frivolous motion for leave to designate responsible third parties.

1979)). We review sanctions imposed under Rule 215 or the court's inherent power for an abuse of discretion. *Koslow's v. Mackie*, 796 S.W.2d 700, 704 (Tex. 1990). We reverse the trial court's ruling only if the court acted without reference to any guiding rules or principles, such that its ruling was arbitrary or unreasonable. *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). Imposition of sanctions is appropriate (1) if there is a direct relationship between the improper conduct and the sanctions imposed—i.e., the sanctions must be directed against the abuse and abuser and be tailored to remedy any prejudice the abuse caused—and (2) if the sanctions are not excessive—i.e., the punishment should fit the crime. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

### 1. Sanctions for failure to produce requested recordings were "just"

Scarbrough contends that the $25,000 sanctions award was not "just" because he did not know that the recorder was relevant and material, requiring preservation. However, as we have discussed, the recorder was material evidence and was not merely duplicative—no witness who had possession or control of the digital recorder confirmed that the recordings on Richeson's server duplicated everything that had been on the recorder, and there was evidence indicating that files were deleted from the recorder. We have also discussed that the evidence not recovered from the recorder before Deaton disposed of it was at least potentially relevant to the Purser Family's claims, as indicated by the recordings that were recovered, and that Scarbrough knew or should have known that the recorder was relevant. *See IQ Holdings, Inc.*, 451 S.W.3d at 868; *Clark*, 317 S.W.3d at 357.

Scarbrough attempts to shift the blame to others for failure to produce recordings during discovery. However, the court's order specified that Scarbrough was also being sanctioned

for "his intentional concealment and deception regarding the existence of audio recordings," conduct that did not implicate anyone else. Actions that callously disregard the rules of discovery warrant a presumption that the actor's claims are meritless because the very purpose of discovery is "to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed." *Khan v. Valliani*, 439 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2014, no pet.). With regard to the order's omission of reference to consideration of lesser sanctions, we note that Scarbrough did not raise that complaint below and he has waived it here. *See* Tex. R. App. P. 33.1(a); *Werley v. Cannon*, 344 S.W.3d 527, 535 (Tex. App.—El Paso 2011, no pet.) (concluding that appellant waived his complaint that trial court did not consider less stringent sanctions by failing to object on that basis below); *see also Bell v. Doreman*, No. 94-50358, 1994 U.S. App. LEXIS 42994, at *4 (5th Cir. Aug. 15, 1994) (stating court need not address issues that were not considered by district court and noting, "Bell's argument, that the district court failed to consider lesser sanction, was not presented to the district court."); *The Shops at Legacy (Inland) Ltd. P'ship v. Fine Autographs & Memorabilia Retail Stores, Inc.*, No. 05-14-00889-CV, 2015 Tex. App. LEXIS 4724, at *5-6 (Tex. App.—Dallas May 8, 2015, pet. denied) (mem. op.) (collecting cases on waiver of appellate complaints about sanctions).

Further, the fees awarded were not excessive. Crews and Ray, the Purser Family's attorneys, testified about their hourly rates and detailed their nearly year-long efforts in obtaining discovery, resulting in their request for fees totaling $53,000. The court's award of $25,000 was far less than the total amount of those fees. Scarbrough failed to demonstrate that the court acted without reference to guiding rules and principles in issuing these sanctions. *See American Flood Research*, 192 S.W.3d at 583. We overrule Scarbrough's complaint that the $25,000 sanctions

46

award was not "just" because he did not know that the recorder was relevant and material, requiring preservation.

## 2. Sanctions for disclosure of Purser's medical records were "just"

Scarbrough's next two issues complain about the court's orders imposing sanctions of $15,959.50 and $11,000 for twice violating the court's order on the confidentiality of Purser Sr.'s medical records: once to Officer Sharon Brank of the Killeen Police Department and then to Carolyn Bolling, Purser Sr.'s niece. During the sanctions hearings, Scarbrough admitted he was bound by the court order, but he claimed he had to divulge the medical records to a law-enforcement expert to obtain the autopsy he wanted performed on Purser Sr. However, Scarbrough testified that the medical records "were of limited value." Scarbrough minimizes his disclosure to Bolling as a "slip of the tongue." The trial court was not persuaded that Scarbrough's disclosure was inadvertent. After listening to Scarbrough's entire recorded conversation with Bolling, the court stated that Scarbrough had quoted from the medical records in an apparent attempt to prejudice a witness. Significantly, both of these medical-record disclosures were made along with Scarbrough's false and defamatory statements about the Purser Family in an alleged attempt to prove that Purser Sr. did not have dementia. But Scarbrough's recorded conversation with his wife revealed that not even Scarbrough himself believed that theory. Scarbrough failed to demonstrate that the court acted without reference to guiding rules and principles in issuing these sanctions. *See id.* We overrule Scarbrough's complaint that the $15,959.50 and $11,000 sanctions awards were not "just."[22]

---

[22] Scarbrough's argument about the order's omission of a reference to consideration of lesser sanctions was not raised below and is waived. *See* Tex. R. App. P. 33.1(a); *Werley v. Cannon*, 344 S.W.3d 527, 535 (Tex. App.—El Paso 2011, no pet.); *see also Bell v. Doreman*, No. 94-50358, 1994 U.S. App. LEXIS 42994, at *4 (5th Cir. Aug. 15, 1994); *The Shops at Legacy (Inland) Ltd.*

### 3. Standing to seek sanctions

Scarbrough cites no authority for his argument that a violation of a court's confidentiality order is unenforceable unless the violation causes injury to someone, thereby providing them with standing to seek sanctions, and that Helen lacked such standing. *See* Tex. R. App. P. 38.1(i). This argument also overlooks the fact that Helen's confidential information was also included in the records, including marriage counseling and other personal incidents between them, and she would have standing to protect the confidentiality of her own information. Scarbrough failed to demonstrate that the court acted without reference to guiding rules and principles in issuing these sanctions. *See American Flood Research*, 192 S.W.3d at 583. We overrule Scarbrough's complaint that Helen lacked standing to seek sanctions for his violations of the court's confidentiality order.

## VI. Waiver of remaining appellate issues

Of the 40 or so appellate issues that Scarbrough, Steele, and Deaton raise, a number are waived.

### A. Appellants waived misjoinder complaint

Appellants contend that the district court lacked jurisdiction over the Purser Family's third-party claims against them because they were not liable for all or part of Olvera's claims against Purser Sr. in the original lawsuit. However, the Purser Family correctly notes that misjoinder of actions is a procedural, not jurisdictional matter. *See Allison v. Arkansas La. Gas Co.*, 624 S.W.2d 566,

---

*P'ship v. Fine Autographs & Memorabilia Retail Stores, Inc.*, No. 05-14-00889-CV, 2015 Tex. App. LEXIS 4724, at *5-6 (Tex. App.—Dallas May 8, 2015, pet. denied) (mem. op.).

568 (Tex. 1981); *Ford Motor Co. v. Texas Dep't of Transp.*, 936 S.W.2d 427, 432 (Tex. App.—Austin 1996, no writ) (noting that any impediments to joining administrative claims with counterclaims would not be jurisdictional); *see also University of Tex. at Austin v. Hinton*, 822 S.W.2d 197, 200 (Tex. App.—Austin 1991, no writ) (concluding that misjoinder complaint raised for first time on appeal was waived). Under Texas Rule of Civil Procedure 41, misjoinder of parties may be addressed on a party's motion or on the court's own initiative before submission of the case, allowing improperly joined actions to be severed and each ground of recovery improperly joined to be docketed as a separate suit between the same parties. Tex. R. Civ. P. 41. Steele and Deaton raise the issue of misjoinder for the first time on appeal and have waived it. *See* Tex. R. App. P. 33.1(a); *Hinton*, 822 S.W.2d at 200.[23]

Unlike Steele and Deaton, Scarbrough filed a motion for severance. But it did not raise his appellate complaint—that the Purser Family's third-party claims against him were improperly joined because he was not liable for all or part of Olvera's claims against Purser Sr.—rather, the motion contended only that severance was proper because he had inadequate time to prepare his defense. With this motion, Scarbrough preserved nothing about his misjoinder complaint. *See* Tex. R. App. P. 33.1(a); *Hinton*, 822 S.W.2d at 200. Scarbrough's misjoinder complaint is waived.[24]

---

[23] We note that the case appellants cite in support of their contention that misjoinder is a jurisdictional issue was decided before the promulgation of Rule 41.

[24] Even if he had preserved this issue, we review a trial court's severance ruling for an abuse of discretion, *see Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996), which is not shown on this record. Scarbrough's motion for severance was denied on the same day that the district court signed Olvera's nonsuit and dismissal with prejudice of his claims against Purser Sr., leaving only the Purser Family's third-party claims against appellants in the suit. Thus, there was nothing for the district court to sever.

49

## B. Scarbrough waived Rule 13 sanctions complaint

Scarbrough contends that the trial court abused its discretion by denying his motion for Rule 13 sanctions, but the record shows that Scarbrough withdrew that motion:

THE COURT: Okay, the next matter has to do with Mr. Scarbrough's Motion for Sanctions for allegedly filing frivolous pleadings under Rule 13. I've read the motion. I've read the response. Mr. Scarbrough, did you wish to make argument?

SCARBROUGH: Your Honor, I'm going to withdraw that motion.

THE COURT: The motion is withdrawn. The Court grants you[] permission to withdraw the motion.

Scarbrough waived his Rule 13 sanctions complaint. *See* Tex. R. App. P. 33.1(a).

## C. Scarbrough waived issue that discovery sanctions restricted his access to the courts

Scarbrough contends for the first time on appeal that the sanctions imposed against him for discovery abuse were excessive and unconstitutional because they restricted his access to the courts. He contends, citing no authority, that the post-judgment filing of his affidavit of net worth, while "not a formal notice that the sanctions assessed precluded access to the courts, [] should be considered such a request." Scarbrough waived his complaint that the discovery sanctions restricted his access to the courts. *See id.*

### D. Steele and Deaton waived spoliation-instruction issue

Steele and Deaton contend that the district court erred in giving a spoliation instruction because there is no evidence that Steele had custody of the digital recorder or failed to preserve it, and because there is no evidence that Deaton had a duty to preserve the recorder when she disposed of it. However, they did not raise the arguments they are making here in their motion for judgment notwithstanding the verdict and failed to otherwise preserve them for appellate review. *See id.*; *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 14 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (concluding that issue in JNOV differed from issue asserted on appeal and was waived); *Lee v. Lee*, 47 S.W.3d 767, 776-77 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (refusing to consider appellate complaint distinct from complaint in JNOV that there was no evidence to support jury's finding). Steele and Deaton waived their complaint that the district court erred in giving a spoliation instruction. *See* Tex. R. App. P. 33.1(a).

### CONCLUSION

We affirm the awards of past mental anguish damages for defamation totaling $1,060,000 ($180,000 against Steele, $180,000 against Deaton, and $700,000 against Scarbrough), reverse the portions of the judgment awarding the other compensatory damages to the Purser Family against Scarbrough, Steele, and Deaton, and render judgment that as to the compensatory damages, the Purser Family take only the $1,060,000 awarded for past mental anguish for defamation. We modify the exemplary damages awarded against Scarbrough to $700,000, against Steele to $200,000, and against Deaton to $200,000 by applying the statutory cap and affirm the awards as modified. Finally, we affirm the district court's orders imposing discovery-abuse sanctions against Scarbrough

51

in the amounts of $25,000, $15,959.50, $11,000, $1,150, and $1,152 and its order imposing discovery-abuse sanctions against Deaton in the amount of $5,000.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Field and Bourland

Affirmed in Part; Modified and, as Modified, Affirmed in Part; Reversed and Rendered in Part

Filed:   December 30, 2016